UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| MARQUELLE L. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-00019-SEB-MPB |
| | ) | |
| HERBERT ADAMS OFFICER, | ) | |
| BLAKE HOLLINS OFFICER, | ) | |
| J.T. VANCLEAVE OFFICER, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Defendants' Motion for Summary Judgment,
Denying Plaintiff Marquelle Smith's Motion for Summary Judgment, and
Directing Entry of Final Judgment**

Plaintiff Marquelle Smith brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that he was subjected to excessive force and racial discrimination by Evansville Police Department officers during a traffic stop on February 20, 2017. Dkt. 25 at 2. He further alleged that the officers impeded his access to medical care after being tasered. *Id.* The Court screened his Complaint on May 25, 2017, and allowed his claims against Officer Adams, Officer Hollins, Officer Vancleave, and Sheriff Williams to proceed. *Id.* The remaining claims and defendants were dismissed. On May 9, 2018, the Court granted the defendants' partial motion to dismiss. Dkt. 40. The only claims remaining are Mr. Smith's excessive force and impediment of medical care claims against Officers Adams, Hollins, and Vancleave.

Now before the Court are cross motions for summary judgment filed by the defendants, dkt. 57, and Mr. Smith, dkt. 61.[1]

---

[1] The defendants argue that the Court should strike Mr. Smith's motion for summary judgment because it is untimely. Dkt. 69 at 2. Because Mr. Smith's motion for summary judgment was filed late by just seven days, and Mr. Smith argues that he submitted the motion for filing timely, dkt. 70, the Court will address the merits of Mr. Smith's motion in this Order.

# I. Summary Judgment Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)).

The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Material Facts[2]

Consistent with the foregoing, the following facts were evaluated pursuant to the standards set forth above. Moreover, certain actions taken and statements made during the relevant shooting, arrest, handcuffing, and subsequent medical care are not in dispute because the Court can base its decision on the audio and video evidence of the body camera videos taken. *See Scott v. Harris*, 550 U.S. 372, 379-81 (2007) ("[the court] should have viewed the facts in the light depicted by the videotape").

Defendants Officers Adams, Hollins, and Vancleave have been patrolmen with the City of Evansville Police Department ("EPD") for over five years each. Officer Amuzie[3] has been a patrolman with the EPD for three years. Officers Adams, Hollins, Vancleave, and Amuzie have all received training through the Indiana Law Enforcement Academy and the Southwestern Indiana Law Enforcement Academy and receive regular training on an annual basis.

On February 20, 2017 at approximately 10:20 p.m.[4], multiple EPD officers, including the defendants, were dispatched to the area of Jefferson Avenue and Bedford Avenue in Evansville,

---

[2] The defendants have included substantial citations to admissible evidence in support of their statement of undisputed facts. *See* dkt. 58 at 2-14. For the sake of conciseness, the Court will exclude citations to the officers' affidavits. Moreover, the Court notes that Mr. Smith has failed to specifically controvert the facts in the defendants' "Statement of Undisputed Facts" with any admissible evidence, as required by Local Rule 56-1(f)(1)(A).

[3] Officer Amuzie is not a named defendant but has submitted an affidavit in support of the defendants' motion for summary judgment.

[4] The Court notes that the body cameras reflect that the dispatch occurred around 8:33 p.m. on February 20, 2017. *See* Dkt. 60 (Exs. 7 and 8).

3

Indiana based on a 911 call for "shots fired and six males [sic] subjects fighting" and that someone had a gun. Multiple witnesses in the area confirmed shots had been fired, including Randy Wolfe ("Wolfe") and his girlfriend, Connie DeWeese ("DeWeese"), and Latiess Reed ("Reed"), a resident of 831 Jefferson Avenue. Dkt. 59-5 at 9-10.

When the officers arrived at the scene, they were in fully marked police cars and wearing their police uniforms with police badges on display. The officers were familiar the area because of similar runs prior to February 20, 2017, including the specific address of 831 Jefferson Avenue as being a residence involved with prior runs for "shots fired."

On February 20, 2017, when the EPD officers, including the defendants arrived, they observed 10-15 people near Jefferson Avenue and Bedford Avenue. Officers Hollins and Amuzie arrived first with Officer Adams arriving shortly thereafter. Officers Adams, Hollins, and Amuzie observed three males near a parked car that was facing eastbound on Jefferson Avenue. One of the males – later identified as Mr. Smith – appeared to be arguing near a car with the other two subjects. Ms. Reed confirmed that Mr. Smith was "mad" because someone had damaged his passenger side mirror. Dkt. 59-5 at 9. Mr. Smith also confirms he was upset at that time and had been drinking that night. Dkt. 59-6 (Smith Depo) at 28:9-10, 32:45-8.

Officers Adams, Hollins, and Amuzie all took defensive positions with their firearms drawn but aimed at the ground and flashlights out. They told the subjects near the car to show their hands, be quiet, and move away from the car. Two of the subjects, but not Mr. Smith, moved towards the sidewalk and away from the car and showed their hands, while Mr. Smith remained by the car.

Officers Adams, Hollins, and Amuzie did not know whether Mr. Smith had a firearm but continued issuing commands to Mr. Smith to show his hands and to not get in the car. Mr. Smith

did not stop and, instead, entered his car and started the engine. Officers Hollins, Adams, and Amuzie continued to yell at Mr. Smith to exit the car. Dkt. 60 (Ex. 7) (Off. Hollins Camera) at 00:03. At that time, Officer Adams was standing in the middle of the street on Jefferson Avenue. Mr. Smith put the car in drive and accelerated toward Officer Adams. Dkt. 60 (Ex. 7) at 00:08. The tire tracks from Mr. Smith's car can be seen in the road. Dkt. 60 (Ex. 8) (Off. Adams Camera) at 4:08. As Mr. Smith's car passed Officer Adams, it veered towards Officer Hollins, and Officer Adams believed Mr. Smith could be attempting to run Officer Hollins over. Officer Adams was also hit with something in his knee.

Multiple EPD officers, including Officers Hollins, Adams, and Amuzie, heard Mr. Smith's tires squeal as he was accelerating and believed Mr. Smith was accelerating his car toward Officer Adams in an attempt to cause serious bodily injury or deadly harm to Officer Adams. Officers Hollins, Adams, and Amuzie were also concerned that Mr. Smith's car could cause serious bodily injury to Officer Hollins, who was in the path of the car, and other civilians who were in the area. Witness Wolfe also observed Mr. Smith's car drive east on Jefferson Avenue "towards the direction of the officers" and "heard the driver accelerate the car." Dkt. 59-5 at 9.

As a result of their belief, Officer Adams and Officer Hollins each fired his EPD-issued firearm at the tires and body of the car attempting to stop Mr. Smith's car. Officer Adams fired his EPD-issued firearm three times. Officer Hollins fired his EPD-issued firearm one time. The bullets struck Mr. Smith's tire and rear door and caused Mr. Smith to crash his car into a garage across the street. Dkt. 59-6 at 45:4-10; Dkt. 59-7 (EPD Photographs) at 1-2. Officer Adams and Officer Hollins did not fire their weapons again after Mr. Smith's car stopped. Officer Vancleave arrived on the scene after Mr. Smith's car crashed into the garage.

5

Officer Hollins and Officer Adams then quickly approached Mr. Smith's car with their firearms out and issued additional, verbal commands to Mr. Smith for him to show his hands and exit the car. Dkt. 60 (Ex. 8) at 00:01; Dkt. 60 (Ex. 7) at 00:13. Mr. Smith heard the officers tell him to turn off the car and put his hands out the window. Dkt. 59-6 at 47:13-16. Witness Wolfe also observed the EPD officers approach Mr. Smith's car and give him commands to exit the car. Dkt. 59-5 at 7. While Mr. Smith initially put his hands outside of his car, dkt. 60 (Ex. 8) at 00:05, he pulled them back into his car outside the view of the officers. Dkt. 60 (Ex. 8) at 00:16. Mr. Smith then threw what the officers believed to be drug contraband out the window of his car and continued to keep his hands inside the car. Dkt. 60 (Ex. 8) at 00:22.

Officers Hollins approached Mr. Smith's car with Officers Adams covering him. Dkt. 60 (Ex. 8) at 00:27; Dkt. 60 (Ex. 7) at 00:38. When Officer Hollins attempted to open the car door, he realized it was locked and proceeded to unlock it in order to get Mr. Smith out of his car and onto the ground. Dkt. 60 (Ex. 8) at 00:27; Dkt. 60 (Ex. 7) at 00:50. At the same time, Mr. Smith put his hands down towards his waist band and appeared to be reaching for something inside of the car. Dkt. 60 (Ex. 8) at 00:30. The officers then told Mr. Smith to keep his hands outside the car and not to reach for anything. Dkt. 60 (Ex. 8) at 00:30. They also ordered Mr. Smith to get out of the car and give them his hands, but Mr. Smith refused. Dkt. 60 (Ex. 8) at 00:32. At some point though, Mr. Smith began repeating, "Pull me out." Dkt. 60 (Ex. 8) at 00:35; Dkt. 60 (Ex. 7) at 00:55. Officer Vancleave grabbed Mr. Smith's arm in an attempt to keep Mr. Smith's hands in view of the officers while pulling Mr. Smith out of the car through the window. Dkt. 60 (Ex. 8) at 00:35; Dkt. 60 (Ex. 7) at 00:55. Midway through Officer Vancleave's effort to pull Mr. Smith out of the window, Mr. Smith began forcibly pulling away from the officers and hooked his foot inside the car in an apparent attempt not to allow himself to be pulled out of the car. Mr. Smith also then

again appeared to reach for something inside of his car. Mr. Smith admits that after the officers told him to show his hands, he still reached into his car towards his waist but claims he was attempting to unbuckle his seatbelt. Dkt. 59-6 at 51:7-15. As a result of Mr. Smith's movements, Officer Vancleave tased Mr. Smith one time not knowing for what Mr. Smith was reaching. Dkt. 60 (Ex. 8) at 00:37; Dkt. 60 (Ex. 7) at 00:57. Mr. Smith was then pulled from the car.

According to Mr. Smith, only Officer Hollins and Officer Vancleave touched Mr. Smith once he was outside his car. Dkt. 59-6 at 55:7-10. Once Mr. Smith was outside the car, the officers continued to give commands to Mr. Smith to give them his hands, but his hands remained under his stomach and out of sight of the officers. Dkt. 60 (Ex. 8) at 00:50. The officers attempted to lift Mr. Smith up to get his hands, but he continued to forcibly resist the officers by pulling away and pulling his body away from the officers. Dkt. 60 (Ex. 7) at 1:13. The officers were eventually able to handcuff Mr. Smith. Dkt. 60 (Ex. 8) at 01:02. For a moment, Mr. Smith apologized to the officers stating, "I'm sorry officers." Dkt. 60 (Ex. 7) at 01:34; Dkt. 60 (Ex. 8) at 1:19. Even after Mr. Smith apologized, he continued to forcibly struggle with the officers and pull his arms away and even yelled, "Fuck that" and "I don't give a fuck," at the officers. Dkt. 60 (Ex. 8) at 1:37; Dkt. 60 (Ex. 7) at 1:52. The officers then told Mr. Smith to roll over, so they could get him off the ground. Dkt. 60 (Ex. 7) at 1:52; Dkt. 60 (Ex. 8) at 1:37.

During this time, EPD officers attempted to keep the peace with a crowd of people that was forming. Dkt. 60 (Ex. 8) at 1:37. At that point, a crowd of people began forming and an unknown individual began walking towards the officers forcing the officers to take their focus off of Mr. Smith and towards the unknown male telling him to go inside his home. Dkt. 60 (Ex. 8) at 01:45; Dkt. 60 (Ex. 7) at 2:02. The unknown individual continued walking towards the officers causing one officer to state, "Watch this guy." Dkt. 60 (Ex. 8) at 2:06. Not knowing what the unknown

male was doing, not knowing if Mr. Smith still had a weapon on him, and as a result of Mr. Smith's aggressive behavior, Mr. Smith had to be secured by taking him to the ground again and taking Mr. Smith to subdue him. Dkt. 60 (Ex. 8) at 2:07; Dkt. 60 (Ex. 7) at 2:14. In the meantime, Mr. Smith became angry when he asked if he could smoke a cigarette and when denied that request, stated, "What do you mean, 'Hell no?'" and started to forcibly resist the officers again by trying to pull away from the officers' grip and get away. Dkt. 60 (Ex. 7) at 2:16; Dkt. 60 (Ex. 8) at 2:09. Mr. Smith also started screaming and cussing at the officers, including "Fuck off" "Fuck y'all," and "I don't give a fuck." Dkt. 60 (Ex. 8) at 2:10; Dkt. 60 (Ex. 7) at 2:23. Mr. Smith continued to repeat threatening statements to the officers. Dkt. 60 (Ex. 7) at 2:30; Dkt. 60 (Ex. 8) at 2:14.

Officer Adams then approached the unknown male and asked him to back away and go inside, which the unknown male would not do. Dkt. 60 (Ex. 8) at 2:17. At the same time, Mr. Smith was lifted up from the ground so that the officers could search him. In response, the unknown male stated, "Now you see why I carry mine" and later referred specifically to carrying a "gun." Dkt. 60 (Ex. 8) at 2:26. Officer Adams believed the unknown male was referring to carrying a firearm. Mr. Smith continued to threaten the officers and attempted to roll over from his stomach to face the officers. Mr. Smith continued to issue what the officers believed were threats, including "You a ho-ass nigga that's on top of me. Bitch you better press yo energy on me. Bitch you better press it." The officers continued to issue verbal commands to Mr. Smith to stop and attempted to use their weight on Mr. Smith to subdue him. Mr. Smith continued to yell, "I don't give a fuck what you do to me." Dkt. 60 (Ex. 7) at 3:03.

While being escorted to a police car, Mr. Smith continued to threaten the officers by stating he would "swing at you." Crack cocaine and marijuana were found on Mr. Smith's person. Following his arrest, when asked why he tried to kill two EPD officers, Mr. Smith would only

8

state, "Charge me, charge me." When the officers searched Mr. Smith's car, they found a large bag of marijuana, gun ammunition (both loose and in an ammunition box), a gun shoulder holster, and a scale. Dkt. 59-7 at 3-7.

Mr. Smith was transported to EPD headquarters and continued to show aggressive behavior towards the EPD officers. Dkt. 60 (Ex. 10) (Officer Amuzie Camera)[5]. Mr. Smith continued to show aggression towards the EPD officers and even asked, "What is [it] gonna take to kill me? Bite your numbers off?" Dkt. 60 (Ex. 10) at 00:24. An EPD Detective attempted to read Mr. Smith his *Miranda* rights and talk to him, but he continued to be argumentative. Instead, the EPD Detective directed the officers to take Mr. Smith to the hospital. Dkt. 59-6 at 75:17-19. When asked if he was injured anywhere, though, Mr. Smith denied being injured. Dkt. 60 (Ex. 10) at 2:05-2:12.

Mr. Smith arrived at the hospital "after an hour – hour or so of the incident."[6] Dkt. 59-6 at 77:12-14. Mr. Smith testifies that, on arrival, he did not tell the medical staff about the taser prongs still being in his back "because the officers told them." Dkt. 59-6 at 76:20-77:2. He further testifies that the officers told the physician that "we shot at him, deplored our taser, and we brung him to the hospital to be evaluated, which I was still in handcuffs, still no discharge papers, still with tasers in my back." Dkt. 59-6 at 77:4-9. Mr. Smith also testifies that the treating physician tended to his eye and the taser prongs that remained in his back. Dkt. 59-6 at 77:10-78:4.

Mr. Smith's interaction at the hospital was captured on Officer Vancleave's body camera. *See generally* Dkt. 60 (Ex. 11). The camera footage of the visit reflects that the officers did not

---

[5] The Court notes that the body camera reflects that Mr. Smith was in the EPD headquarter at 8:16 p.m. on February 20, 2017. *See* Dkt. 60 (Ex. 10).

[6] The Court notes that the body camera reflects that Mr. Smith was brought to the hospital at 9:33 p.m. on February 20, 2017. *See* Dkt. 60 (Ex. 11).

9

interfere with Mr. Smith's medical treatment, and instead allowed the physician and nurse to ask Mr. Smith questions and administer treatment. *Id.* The officers explain to the medical personnel that police officers shot at Mr. Smith but that they did not think he was hit. *Id.* at 00:55. Mr. Smith can be heard explaining to two nurses that he was shot at by the officers and providing other information. *Id.* at 1:30-1:55. He also explains to a nurse that his head hurts because it hit a door. *Id.* at 1:56-2:07. Mr. Smith continues to talk uninhibited with the two nurses and physician for a period of time. *See id*. Moreover, the video reflects that the physician examined Mr. Smith's back, including to look for taser prongs. *Id.* at 05:34-05:58. Mr. Smith also refers to being tased as a "weak-ass taser" multiple times and that the officer might as well "shoot me" and begins to laugh. *Id.* at 7:10. Mr. Smith also admits, "I was being a knucklehead tonight." *Id.* at 11:15. Mr. Smith also concedes that he heard the officers telling him to put his hands out. *Id.* at 11:51.

Mr. Smith was then taken to the Vanderburgh County Jail. Dkt. 59-6 at 77:11-12. Upon arrival at the jail, he discovered that a taser prong was still in his back. *Id.*, 77:18-78:2; Dkt. 1, ¶ 16. The taser prong that remained in Mr. Smith's back was found and then removed by a nurse at the Jail. Dkt. 1, ¶ 20. During the time between Mr. Smith's discharge from the hospital until his arrival at the jail, Mr. Smith never told the officers that a taser prong remained in his back. *See generally*, dkt. 1; *see also generally*, Dkt. 59-6.

Following Mr. Smith's arrest, Officer Hollins and Officer Adams submitted blood samples to be tested, pursuant to EPD policy. The test results reflect that both officers were not under the influence of alcohol or drugs.

III. **"Facts" Set Forth in Mr. Smith's Motion for Summary Judgment and Response**

Although Mr. Smith has filed his own motion for summary judgment, an affidavit, and certain evidence in support of his motion, *see* dkts. 61, 62, Mr. Smith fails to set forth material

facts that are not in dispute, nor has he cited to "a discovery response, a deposition, an affidavit, or other admissible evidence" in support of his facts, as required by Local Rule 56-1. Although the Court generally construes *pro se* pleadings liberally, Mr. Smith must still set forth coherent facts and arguments supported by evidence, which he has failed to do.

The totality of Mr. Smith's affidavit is that "[t]he facts related to the Plaintiff's complaint are as follows: treatment of the Plaintiff and lifelong injuries he will have to endure Mental PTSD, Left shoulder injury, lower back injury." Dkt. 62 at 1. Moreover, to the best of the Court's knowledge, the following are Mr. Smith's "facts:"

- "he suffers cuts under right eye in back pain in swelling around ankles and writs from the handcuffed." Dkt. 61 at 2. Mr. Smith fails to submit any records or affidavits in support of this allegation.

- "Plaintiff's Southwestern Behavioral Healthcare documents where the Plaintiffs has been having mental anguish from the terroristic attack from The Defendants the state psychologist interview the Plaintiff's in later was diagnose with PTSD from the trauma he endured from the excessive force the officers used to obtain a arrest." Dkt. 61 at 2. The records submitted by Mr. Smith from Southwestern Behavioral do not include any diagnosis for Post-Traumatic Stress Disorder (PTSD), but only indicate that Mr. Smith was "suitable for population" or to "remain in population" and that he feels "excellent." *See* dkt. 62-1 at 70-74.

- X-ray documents show that he suffered injury to his back and shoulder. Dkt. 61 at 2. However, Mr. Smith's submissions from Meridian Radiology reflect that the radiologist found everything examined to appear intact with no acute fractures, dislocation, or degenerative change. Dkt. 62-1 at 43-46.

- "Marquelle L. Smith couldn't speak to a doctor or physician to get evaluated for the laser prongs that was still attach to Marquelle L. Smith back." Dkt. 61 at 6. As explained above, the audio and video from the body camera recording of Mr. Smith's medical evaluation reflects that no officers inhibited Mr. Smith's interactions with the medical staff and that he was free to communicate with them.

Accordingly, Mr. Smith has failed to set forth any material facts not in dispute in support of his own motion for summary judgment.

Similarly, in his response to the defendants' motion for summary judgment, Mr. Smith includes facts that are alleged supported by reference to items that have not been submitted for the Court's consideration, including depositions of the defendants, a body camera of Officer Campbell, and a call between Reed and a Detective B. Melton. Because these items are not before the Court, the Court will not find as true any such facts that are only unsupported by evidence.

## IV. Discussion

The claims that remain at issue are Mr. Smith's excessive force and impediment of medical care claims against Officers Adams, Hollins, and Vancleave. Each claim is discussed in further detail below.

### A. Excessive Force Claim

Mr. Smith argues that Officer Adams exercised excessive force for firing at his car. He argues that Officer Vancleave exercised excessive force when he pulled Mr. Smith out of the car window and tasered him two times. Finally, he argues that Officer Hollins exercised excessive force by firing at his car and later punching, kicking, and putting him in a chokehold.

#### 1. Legal Standard

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Claims alleging violations of the Fourth Amendment's Warrant Clause can raise "two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009) ("In evaluating an alleged violation of the Warrant Clause of the Fourth Amendment, we look at two distinct aspects of the warrant -- its issuance and its execution").

When assessing whether a constitutional violation has occurred, "the Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances." *Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003); *see Graham v. Connor*, 490 U.S. 386, 399 (1989).

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* at 396 (citations and internal quotation marks omitted). Factors relevant to the inquiry include: "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird v. Renbarger,* 576 F.3d 340, 344 (7th Cir. 2009) (alterations in original) (quoting *Graham*, 490 U.S. at 396).

An officer's use of force is "judg[ed] from the totality of the circumstances at the time of the [seizure]." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (alterations in original) (citation and internal quotation marks omitted). "'[W]hen material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers,'" therefore, "[i]n this situation...the reasonableness of the force used is a legal question." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (emphasis in original) (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)). The measure of reasonableness is made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Only the facts known to the officer at the time of the incident are relevant to the reasonableness determination. *Fitzgerald v. Santoro*, 707 F.3d 725, 732-733 (7th Cir. 2013). Reasonableness is not based on hindsight, but rather is determined considering the

perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *DeLuna v. City of Rockford, Illinois*, 447 F.3d 1008, 1010 (7th Cir. 2006).

### 2. Shooting at the Car (Officers Adams and Hollins)

The first alleged use of "excessive force" was when Officers Adams and Hollins shot at Mr. Smith's car as he sped toward and then away from the officers, before hitting a garage. The actions taken and the statements made are not in dispute because the Court can base its decision on the audio and video evidence of the body camera video taken of the shooting. *See Scott*, 550 U.S. at 379-81 ("[the Court] should have viewed the facts in the light depicted by the videotape.").

Specifically, Officers Adams and Hollins were responding to a report that there was a fight and shots fired. At the time they arrived on the scene, they did not know whether Mr. Smith had a firearm but had issued commands to Mr. Smith to show his hands and to not get in the car. Instead, Mr. Smith did not stop and entered his car and started the engine. Mr. Smith put the car in drive and accelerated toward Officer Adams, almost hitting Officer Adams. As Mr. Smith's car passed Officer Adams, it veered towards Officer Hollins instead. The officers feared that Mr. Smith was attempting to hit either Officer Adams or Officer Hollins. Consequently, they fired their firearms at the at the tires and body of the car attempting to stop Mr. Smith's car.

As set forth previously, the three factors in considering whether use of force was reasonable are: "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird,* 576 F.3d at 344. Here, the officers were responding to a call that there was fighting and shots fired. When they responded and ordered the participants to stop, Mr.

Smith instead entered his car and almost ran over two officers – the officers also feared that he posed an immediate threat to others. Finally, the officers reasonably assumed that Mr. Smith was attempt to evade arrest by speeding away. Considering the three factors set forth by the Supreme Court, the Court finds that Officers Adams and Hollins' use of "force" was reasonable and not greater than necessary. *See, e.g.*, *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018) (internal citations omitted) ("When an officer reasonably believes an assailant's actions place 'him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'"); *id.* ("As a form of defense of others, a police officer also may sometimes constitutionally use deadly force to prevent escape."). Because there are no material facts in dispute, summary judgment on the excessive force claim against Officers Adams and Hollins regarding the shooting is appropriate.

### 3. Being Pulled out of the Car and Being Tasered (Officer Vancleave)

The second alleged use of "excessive force" was when Officer Vancleave pulled Mr. Smith out of the car window and later tased him two times. Again, the actions taken and the statements made are not in dispute because the Court can base its decision on the audio and video evidence of the body camera video taken of the incident. *See Scott*, 550 U.S. at 379-81.

The undisputed evidence reflects that when the officers approached Mr. Smith's car after it crashed, they attempted to open the car doors, but found that it was locked. The officers yelled at Mr. Smith to put his hands up and to get out of the car. Mr. Smith instead put his hands down towards his waist band – he alleges he was trying to unbuckle his seat belt, but the officers did not have any such knowledge at the time and instead were unsure if he possessed a firearm. *See Fitzgerald*, 707 F.3d at 732-733 (Only the facts known to the officer at the time of the incident are relevant to the reasonableness determination.) The officers again ordered Mr. Smith to get out of

the car and show them his hands. At some point, though, Mr. Smith began repeating "Pull me out." While pulling Mr. Smith out, the officers grabbed Mr. Smith's arms in an attempt to keep his hands in view. Midway through Officer Vancleave's effort to pull Mr. Smith out of the window, Mr. Smith began forcibly pulling away from the officers and hooked his foot inside the car in an apparent attempt not to allow himself to be pulled out of the car. Mr. Smith also then again appeared to reach for something inside of his car. Mr. Smith admits that after the officers told him to show his hands, he still reached into his car towards his waist. As a result of Mr. Smith's movements, Officer Vancleave tased Mr. Smith one time not knowing for what Mr. Smith was reaching. Mr. Smith was then pulled from the car.

Here, after having attempted to flee and hit officers in his car but instead crashed, Mr. Smith resisted the officers' orders to show his hands and leave his car. Mr. Smith kept reaching back into his car, including reaching towards his waist. The officers were unsure if Mr. Smith had a firearm. At some point, Mr. Smith told the officers to pull him out, but then changed course and attempted to forcibly pull away, resisting arrest. Considering the three factors set forth by the Supreme Court, the Court finds that that Officer Vancleave's use of "force" was reasonable and not greater than necessary and that no reasonable jury would find that the tasing was unreasonable. *See, e.g.*, *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (finding use of taser reasonable where a defendant "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"). Because there are no material facts in dispute, summary judgment on the excessive force claim against Officer Vancleave is appropriate.

### 4. Punches, Kicks, and Chokehold (Officer Hollins)

Finally, Mr. Smith argues that after he was pulled from the car, Officer Hollins punched, kicked and put him into a chokehold and that this was excessive. As with the other claims, the actions taken and the statements made are not in dispute because the Court can base its decision on the audio and video evidence of the body camera video taken of the incident. *See Scott*, 550 U.S. at 379-81.

Once Mr. Smith was pulled from the car, Mr. Smith continued to resist the officers' orders. When they ordered him to give them his hands, his hands remained under his stomach and out of officers' sight. The officers attempted to lift Mr. Smith up to get his hands, but he continued to forcibly resist the officers by pulling away and pulling his body away from the officers. The officers were eventually able to handcuff Mr. Smith. Even so, he continued to forcibly struggle with the officers and pull his arms away and even yelled, "Fuck that" and "I don't give a fuck," at the officers.

Although Mr. Smith argues that he was punched, kicked, and put into a chokehold, Officer Hollins characterizes his actions as using his weight on Mr. Smith as necessary to gain compliance. Having watched the videos, the Court agrees with Officer Hollins' characterization of the use of force as reasonable and necessary to the arrest and cuffing process. Having almost been run down by a car and spending considerable effort to get Mr. Smith safely out of the car, Mr. Smith continued to resist arrest and was cursing at the officers. In the volatile situation where they were not sure if Mr. Smith had a gun and where a crowd was forming, Officer Hollins' use of his weight to gain compliance was reasonable. As the Supreme Court has previously explained, "[n]ot every push or shove…violates the Fourth Amendment." *Graham,* 490 U.S. at 396. "An officer who has the right to arrest an individual also has the right to use a reasonable degree of physical force… to

effectuate the arrest." *Id.* Considering the three factors set forth by the Supreme Court — the severity of the crime, whether there is an immediate threat to the officer's safety, and whether the plaintiff was actively resisting — the Court finds, based on the video evidence, that Officer Hollins' use of "force" was reasonable and not greater than necessary. Because there are no material facts in dispute, summary judgment on the excessive force claim against Officer Hollins regarding the use of weight is appropriate.

       5.       Qualified Immunity

The defendants argue that to the extent Mr. Smith's constitutional rights were violated, they are all entitled to qualified immunity.

Qualified immunity protects government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

For the reasons explained above, there was no constitutional violation, so a qualified immunity defense is not necessary. *See Flournoy v. City of Chi.*, 829 F.3d 869, 877 n.10 (7th Cir. 2016) ("The defendants alternatively argue that we should affirm based on qualified immunity. Because we uphold the jury's verdict that no constitutional violation occurred, we do not reach this alternative argument.").

    **B.**    **Impediment of Medical Care Claim**

The Fourth Amendment applies to individuals, like Mr. Smith here, who have been arrested without a warrant but have not yet been taken before a judge for a probable cause determination.

*Lopez v. City of Chicago,* 464 F.3d 711, 718-20 (7th Cir. 2006); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). Under the Fourth Amendment, a defendant is liable for providing inadequate medical care if the defendant's response to the plaintiff's medical need is objectively unreasonable. *Lopez*, 464 F.3d at 719. This is an easier standard to meet than the Eighth Amendment's deliberate indifference standard. *Id.* "To establish a Fourth Amendment denial of medical care claim, [Mr. Smith] must establish that (1) Defendants' failure to provide him with medical care was objectively unreasonable under the circumstances, and (2) Defendants' conduct caused him harm." *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1050 (N.D. Ill. 2011); *see also Ortiz*, 656 F.3d at 530.

The undisputed evidence here reflects that the defendants did not impede or deny medical care to Mr. Smith. Within an hour of being tasered, Mr. Smith was brought to the hospital to be seen by medical staff. The video and audio evidence reflect that medical staff was informed that Mr. Smith had been shot at and tasered and that none of the officers impeded the staff from communicating with and treating Mr. Smith. Indeed, the video shows that a physician inspected Mr. Smith for any injuries and for taser prongs. No officers rushed any medical staff in their evaluation and examination. Nor is there any evidence that the officers were aware that there was still a taser prong in Mr. Smith's back after the medical visit. Summary judgment in the defendants' favor is warranted.

## V. Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed,

"it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Mr. Smith has not identified a genuine issue of material fact as to his remaining claims in this case and the defendants are entitled to judgment as a matter of law. Therefore, the defendants' motion for summary judgment, dkt. [57], is **granted**. Mr. Smith's motion for summary judgment, dkt. [61], is **denied**.

Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 04/09/2019

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MARQUELLE L. SMITH
267850
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Electronically Registered Counsel